**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**WILLIAM R. MILLER,**

      **Plaintiff,**

      **v.**

**GREAT AMERICAN INSURANCE
COMPANY,**

      **Defendant.**

**Case No. 20-2583-DDC**

---

## <u>MEMORANDUM AND ORDER</u>

This case arises from an insurance coverage dispute. Plaintiff William R. Miller filed an insurance claim with defendant Great American Insurance Company. Plaintiff claimed his residence sustained damage from a broken water line that flooded his home. Plaintiff sought coverage for the damage under an insurance policy defendant had issued for plaintiff's property. Defendant denied the claim after concluding that plaintiff's insurance policy didn't provide insurance coverage for the claimed damage.

Plaintiff brings this lawsuit seeking (1) a declaratory judgment that the damage to plaintiff's residence is a covered loss under the insurance policy, (2) damages for defendant's breach of contract, and (3) attorney's fees under Kan. Stat. Ann. § 40-256 based on defendant's denial of the insurance claim "without just cause or excuse."[1] Defendant asserts a Counterclaim seeking a declaratory judgment that plaintiff's claimed losses and damage are not covered or are excluded from coverage under the insurance policy it issued to plaintiff. Defendant now moves for summary judgment against plaintiff's claims and in its favor on its declaratory judgment

---

[1] The court has diversity subject matter jurisdiction under 28 U.S.C. § 1332. Plaintiff is a Kansas citizen; defendant is an Ohio citizen; and the amount in controversy exceeds $75,000. Doc. 1 at 1–2 (Notice of Removal ¶¶ 3, 5–6).

claim.  For reasons explained below, the court grants defendant's Motion for Summary Judgment (Doc. 63).

## I.    Uncontroverted Facts

The following facts either are stipulated in the Pretrial Order (Doc. 61), uncontroverted, or where genuinely controverted, viewed in the light most favorable to the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378–80 (2007).

### *The Insurance Policy*

Defendant issued an insurance policy to plaintiff under policy number APK E261214 00 ("the Policy").  Doc. 61 at 2 (Pretrial Order ¶ 3).  The Policy provided insurance coverage for property that included plaintiff's residence in Stillwell, Kansas.  *Id.* (Pretrial Order ¶ 7).  Plaintiff paid the premium in full for the Policy.  *Id.* (Pretrial Order ¶ 6).  The Policy was effective from September 6, 2017, to September 6, 2018.  *Id.* (Pretrial Order ¶ 5).

One of defendant's adjusters testified that an insured can choose one of four different forms of coverage:  basic coverage, broad coverage, special/broad, or special.  Doc. 72-10 at 16–17 (Cline Dep. 66:21–67:11).  Each form of coverage insures "different perils."  *Id.* at 17 (Cline Dep. 67:2–17).  Basic coverage covers those things that typically are covered causes of loss such as fire, lightning, wind, and hail.  *Id.* (Cline Dep. 67:4–8).  Broad coverage expands the basic coverage "a bit."  *Id.* (Cline Dep. 67:8–9).  Special form of coverage is referred to as "open peril coverage, which essentially means that unless [the peril is] specifically excluded in the form, it's covered."  *Id.* (Cline Dep. 67:12–15).  Defendant's adjustor testified that special coverage is essentially all-risk coverage, meaning that all risks are covered unless the Policy specifically excludes them.  *Id.* (Cline Dep. 67:21–24).  Plaintiff purchased the broadest form of property coverage—*i.e.*, special coverage—for his home.  *Id.* at 17–18 (Cline Dep. 67:25–68:2).  The

Policy covered plaintiff's "main dwelling" with a limit of $1,400,000.  *Id.* at 16 (Cline Dep. 66:5–8).

***The Policy's Terms***

The Policy contains the following coverage terms:

**COVERAGE A – DWELLINGS**

**A.  Coverage**

> We will pay for direct physical loss of or damage to Covered Property at the "insured location" described in the Declarations, or elsewhere as expressly provided below, caused by or resulting from any Covered Cause of Loss.
>
> **1.  Covered Property**
>
> The following are Covered Property under Coverage A of this Coverage Form:
>
> **a.**  Each "dwelling" owned by you and for which a Limit of Insurance is shown in the Declarations.

Doc. 64-1 at 29 (Policy).  The Policy's "insured location" includes plaintiff's residence.  *Id.* at 11 (Policy); Doc. 72-10 at 13 (Cline Dep. 63:2–5).

The Policy excludes from coverage the following exclusions:

**Section C.  Exclusions.**

The following Exclusions apply when any or all of the Covered Causes Of Loss, **Basic**, **Broad** or **Special**, are specified in the Declarations.

We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

. . .

2.  Earth Movement

> a.  Earthquake, including any earth sinking, rising or shifting related to such event;

b. Landslide, including any earth sinking, rising or shifting related to such event;

c. Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity ceased;

d. Earth sinking (other than "sinkhole collapse"), rising or shifting including soil conditions that cause settling, cracking or other disarrangement of foundations or other parts of realty.  Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

This exclusion applies whether the Earth Movement, as described in Paragraphs **a.** through **d.** above is caused by human or animal forces or any act of nature.

Doc. 64-1 at 50–51 (Policy).  The Policy incorporates the "SECTION C.  EXCLUSIONS" into the special covered causes of loss form, as follows:

**B.3      COVERED CAUSES OF LOSS – SPECIAL**

. . .

When Special is shown in the Declarations, Covered Causes of Loss means **Risks of Direct Physical Loss** unless the loss is excluded in the following paragraphs or in Section C. Exclusions.

a. We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

Doc. 64-1 at 84 (Policy).

Also, the Policy includes the following general conditions and loss conditions:

**SECTION G.  FARM PROPERTY CONDITIONS AND VALUATIONS**

The following conditions apply in addition to the Common Policy Conditions and the conditions in the individual Coverage Forms, the following conditions apply to all Farm Property coverages under this policy:

**GENERAL CONDITIONS**

. . .

4

**6. Policy period**

> We cover only such loss or damage that commences during the policy period
> shown in the Declarations.

Doc. 64-1 at 63, 65 (Policy).

*Plaintiff's Insurance Claim*

On August 3, 2018, plaintiff's son discovered water running from a spigot on the west

side of plaintiff's home.  Doc. 72-11 at 3 (Miller Aff. ¶ 16).  Plaintiff's son shut off the water to

the home and contacted plaintiff, who was traveling out of state.  *Id.* at 1, 3 (Miller Aff. ¶¶ 6, 17).

On September 7, 2018, plaintiff submitted a claim for property damage at his house from

a "water line failure" and identified the date of loss as August 4, 2018.  Doc. 64-3 at 4 (Miller

Dep. 68:17–69:3); Doc. 64-4 (Property Loss Notice).  The house where the water line failure

occurred was built in 1990 and 1991.  Doc. 64-3 at 5 (Miller Dep. 145:14–20).  Plaintiff testified

that a water line had failed and leaked from an outside spigot and also ran down a basement wall

and into a crack between the wall and the floor.  *Id.* at 2 (Miller Dep. 38:21–41:7).  The water

from the water line failure saturated some boxes and drywall and loosened three bathroom tiles,

but plaintiff doesn't seek recovery under the Policy for these damages.  *Id.* at 2–3 (Miller Dep.

41:2–42:19).  Instead, plaintiff asserts that the water line failure caused "foundation heaving" to

the home.  Doc. 61 at 5 (Pretrial Order ¶ 3.a.3.).  Plaintiff doesn't know how much water leaked

inside his home from the water line failure.  Doc. 64-3 at 2 (Miller Dep. 39:5–40:9).

After plaintiff filed his insurance claim, defendant assigned Michael Cline as the Claim

Supervisor.  Doc. 72-11 at 3 (Miller Aff. ¶ 18).  Mr. Cline called plaintiff on September 7, 2018.

Doc. 72-10 at 4 (Cline Dep. 22:5–11).  Plaintiff told Mr. Cline about a "pipe break" at his home

that happened while he was out of town.  *Id.* at 5 (Cline Dep. 24:10–16).  Plaintiff described

interior damage to his home including the drywall.  *Id.* at 5–6 (Cline Dep. 24:17–25:12).  Mr.

Cline hired field adjustor Mike Sutton to inspect plaintiff's home.  *Id.* at 6, 8 (Cline Dep. 25:13–18, 27:9–12).  On September 11, 2018, Mr. Sutton inspected plaintiff's home.  *Id.* at 8 (Cline Dep. 27:18–23).  Afterwards, Mr. Sutton prepared a report of his inspection.  *Id.* (Cline Dep. 9–17); Doc. 72-14 (Sutton Report).  Mr. Sutton's report recited that he "was assigned with inspecting the insured dwelling and checking for signs of dwelling movement due to a broken exterior water spigot on the west wall of the dwelling."  Doc. 72-14 at 1.  Mr. Sutton noted that he could not "determine if the aforementioned conditions [*i.e.*, damage to the home] are the result of this leaking water spigot."  *Id.*  So, at "company direction," Mr. Sutton "retained the services of Norton and Schmidt Engineering" to "inspect the dwelling and provide a report on the cause of the conditions listed" in the report.  *Id.*  Mr. Sutton noted that "Engineer Larry Fehner is scheduled to meet with the insured and inspect the dwelling[.]"  *Id.*

On October 1, 2018, Lawrence Fehner, an engineer retained by defendant, inspected plaintiff's residence.  Doc. 61 at 3 (Pretrial Order ¶ 10); Doc. 64-6 at 3 (Fehner Dep. 29:9–11).  Mr. Fehner is a licensed professional engineer in Kansas and Missouri.  *Id.* at 2 (Fehner Dep. 10:7–11).  Mr. Fehner has examined more than 20,000 residential and commercial structures in his more than 30 years as an engineer with the Norton & Schmidt firm.  *Id.* at 2, 5, 6 (Fehner Dep. 9:8–11, 69:20–25, 83:2–83:6).  Mr. Fehner knows about the composition of the soils in the Greater Kansas City area based on his experience.  *Id.* at 6 (Fehner Dep. 81:25–83:19).  But, he doesn't practice specialty work as a soils or geotechnical engineer.  Doc. 72-6 at 25 (Fehner Dep. 118:7–13).

Mr. Fehner performed a "dry sample test" of the soil at plaintiff's home.  Doc. 64-6 at 6 (Fehner Dep. 83:25–84:3).  He testified that he reached under the deck and grabbed a handful of soil and examined it.  *Id.* (Fehner Dep. 84:9–24).  From that examination, Mr. Fehner determined

that clay was present in the soil.  *Id.* at 6–7 (Fehner Dep. 84:25–86:1).  Mr. Fehner didn't

perform any other soil testing on plaintiff's property.  *Id.* at 6 (Fehner Dep. 83:25–84:3).

Also, Mr. Fehner took level measurements in the basement of plaintiff's house and found

areas of settlement and heave.  *Id.* at 4–5, 9 (Fehner Dep. 66:20–69:14, 97:19–98:15); Doc. 72-7

at 3–5, 8 (Fehner October Report).  Mr. Fehner observed cracks in the basement floor slab,

"most" of which he described as "older" and "weathered, worn and dark."  Doc. 64-7 at 4

(Fehner October Report).  Plaintiff disagrees with Mr. Fehner's observations, asserting that the

cracks "which [Mr.] Fehner claims were old were recent cracks."  Doc. 72-11 at 1 (Miller Aff. ¶

5).

Plaintiff's expert testified that "heave" can occur as expansive soils get wet, causing the

soil to expand and the structure on that soil to move upward.  Doc. 64-5 at 7 (Minto Dep. 183:6–

184:14); *see also* Doc. 72 at 8 (Pl.'s Resp. to Def.'s Mot. for Summ. J. ¶ 22) (uncontroverted

fact).  Settlement also can occur when soils contract due to drying.  Doc. 64-5 at 7, 9 (Minto

Dep. 183:6–184:14, 192:24–193:12); *see also* Doc. 72 at 8 (Pl.'s Resp. to Def.'s Mot. for Summ.

J. ¶ 23) (uncontroverted fact).  Settlement and heave are "earth movement."  Doc. 64-5 at 7

(Minto Dep. 183:6–183:21); *see also* Doc. 72 at 8 (Pl.'s Resp. to Def.'s Mot. for Summ. J. ¶ 25)

(uncontroverted fact).

Mr. Fehner's Report explains that uneven movement and distortion from heave and

settlement beneath a structure "can appear as cracks in concrete floor slabs, vertical cracks in

basement walls, cracks in the interior wall and ceiling finishes at doors and windows, and doors

that stick or do not close tightly."  Doc. 64-7 at 4 (Fehner October Report).

Mr. Fehner concluded from his October 1, 2018 inspection of plaintiff's home that

"swelling and shrinkage of the expansive clay subsoils found beneath the home" caused the

"[v]ariations in the elevations" and "gaps between the basement floor slab . . . and the basement walls" in plaintiff's house.  *Id.* at 4 (Fehner October Report).  Also, Mr. Fehner found that the "dead weight of the concrete floor, wall and ceilings" caused "dead load consolidation and compression of the subsoils," which "caused some of the outward movement of the basement walls, leaving [a] gap between them and the basement slab."  *Id.*  Mr. Fehner observed that the "exterior walls have also shifted outward slightly due to extremely dry droughty weather[.]"  *Id.* But, he found that the "interior concrete common walls and the walls around the stairways have not subsided/settled as much as the exterior walls."  *Id.* at 5.  Mr. Fehner observed that the basement floor slab was "heaved upward . . . by the expansive clay subsoils" during past "wet weather[.]"  *Id.*  And, Mr. Fehner concluded that "differential movement between the exterior walls and the interior precast concrete walls around both stairways and the common wall areas between the wings and the core area of [plaintiff's] home resulted in . . . humps in the floors[.]" *Id.*

From his observations of plaintiff's home, Mr. Fehner opined:  "[T]here has been some downward differential movement in the exterior basement walls, lessor movement of the common walls and stairway walls and some upheaval of the basement floor slab that have developed over the years due to the swelling and shrinkage of the expansive clay subsoils beneath the home."  *Id.* at 6.  Mr. Fehner concluded that "this condition has been exacerbated by the water loss that occurred in . . . 2018."  *Id.*; Doc. 64-6 at 10 (Fehner Dep. 115:24–116:10). And, he opined:

> Water from the broken hose faucet saturated the soils beneath the home exacerbating the upheaval of the basement floor slab causing some additional slight lifting and some additional distortions in the finishes of the home.  Additionally, several exterior sealant joints on each side of the west stair and at the ends of the common wall areas pulled apart and will need to be cut out and then resealed.

Doc. 64-7 at 6–7 (Fehner October Report).

Mr. Fehner opines that the differential movement issue with plaintiff's home has existed for years and did not occur suddenly from the water that leaked into the home after the water line failure. Doc. 64-6 at 10 (Fehner Dep. 115:24–116:7); Doc. 64-7 at 3–6 (Fehner October Report); Doc. 64-9 at 3 (Fehner June Report).

Plaintiff testifies that none of the damage to his house was present before August 2018. Doc. 72-11 at 1–2 (Miller Aff. ¶¶ 6–8); *see also id.* at 4 (Miller Aff. ¶ 32) (asserting that none of the damage shown in the photographs in Mr. Fehner's October Report existed when he left his home on August 1, 2018, to travel out of state). Plaintiff believes the damage "was a result of a broken ¾ inch water supply line which occurred in August of 2018." *Id.* at 2 (Miller Aff. ¶ 7). Also, plaintiff testified, "several years" before the water line failure, the home had cracks "which happened in [plaintiff's] office upstairs" and "one or two locations downstairs." Doc. 75-1 at 2–3 (Miller Dep. 105:20–106:23). After his examination of the home, Mr. Fehner observed that "repairs have already been made to the hardwood floors" in the area where the floors had humps, but he noted, "however, they are somewhat poor in quality and do not match well." Doc. 64-7 at 6 (Fehner October Report). Mr. Fehner reported that plaintiff "did not make it clear as to the reason the hardwood flooring was spot repaired or when." *Id.*

On October 25, 2018, defendant denied plaintiff's insurance claim. Doc. 61 at 3 (Pretrial Order ¶ 12); *see also* Doc. 72-15 (Denial Letter). Defendant denied plaintiff's claim citing Exclusion 2, Earth Movement, and Exclusion 9, Water. Doc. 72-15 at 2–3. The denial letter also cited Section B. and Subsections B.3., a(23)(d) and (g). *Id.* at 3.

The Policy's Section "B.3. COVERED CAUSES OF LOSS – SPECIAL," provides that a special loss is covered "*unless the loss is excluded in the following paragraphs or in Section C.*"

Doc. 64-1 at 84 (Policy) (emphasis added).  It also provides:  "We will not pay for loss or damage caused directly or indirectly by any of the following[,]" which includes "(d) Settling, cracking, shrinking or expansion;" and "(g) Dampness or dryness of atmosphere[.]"  *Id.* at 84, 88 (Policy).  Section B.3. explains:  "Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."  *Id.* at 84 (Policy).

> The October 25, 2018 denial letter explained:

> As you can see in the above-referenced policy language, earth movement and/or soil conditions which result in damage to a structure is excluded.  This applies whether the cause is natural or man-made in origin.  The policy also does not cover losses where water below the surface of the ground pushes/pressures foundations. In addition, the policy excludes coverage for damage that is the result of a long-term water leak, specifically anything which has been ongoing for more than two weeks, as well as any loss that is the result of settling, cracking, shrinking, expanding and/or atmospheric conditions.

Doc. 72-15 at 3–4 (Denial Letter).

### *Plaintiff's Expert*

On April 10, 2019, Paul Minto inspected plaintiff's home.  Doc. 72-5 at 16–17 (Minto Dep. 94:25–95:6); Doc. 72-12 at 1 (Minto Report).  Mr. Minto is an architect licensed in eight states, including Kansas.  Doc. 72-5 at 4 (Minto Dep. 27:13–16).  Mr. Minto has practiced as an architect for almost 40 years.  *Id.* at 3 (Minto Dep. 23:6–7).  Mr. Minto operates Urban Prairie Architectural Collaborative, PC, a small architectural firm.  *Id.* at 2 (Minto Dep. 19:5–9).

When Mr. Minto inspected plaintiff's home in April 2019, he noticed rings of calcium and salts around the floor drains in the basement of the home.  *Id.* at 5–6 (Minto Dep. 52:14–53:6).  Mr. Minto testified that these rings of calcium and salts around the floor drains showed that, for a long period of time, the floor drains had performed and done what they were supposed to do—*i.e.*, collect water.  *Id.*  During the inspection, Mr. Minto poured water on the concrete floors to determine whether the water would flow towards or away from the drain.  *Id.*  Mr.

Minto observed that the water flowed away from the drains, suggesting to him that the change in the floor slope was more recent. *Id.* Mr. Minto saw no visible signs of the water sloping away from the drains, but he observed visible signs that water had flowed towards the drains for a number of years—easily 10 to 15 years. *Id.* at 6–7 (Minto Dep. 53:8–54:1).

On August 15, 2021, Mr. Minto prepared a revised report. Doc. 72-12 (Minto Report). Mr. Minto testified that because plaintiff's home is constructed with precast concrete panels, if the precast panels start to move, it can transmit that movement throughout the home. Doc. 72-5 at 15 (Minto Dep. 88:3–19). Mr. Minto testified that generally speaking, a wood frame structure is more forgiving than a concrete structure. *Id.* (Minto Dep. 88:20–22).

Mr. Minto's Report recites his opinion that "water from the failed plumbing radically exacerbated the typical cycle of shrink/expand and created movement well beyond any previous movement the [h]ome had experienced." Doc. 72-12 at 2 (Minto Report). In Mr. Minto's opinion, "the extent of the observable damage greatly exceeds the damage often associated with the cumulative effects of seasonal moisture changes." *Id.* Mr. Minto's Report offers the following conclusion:

> It is my opinion water from the broken water line . . . exacerbated the differential subsoil movement conditions that are at this home. Water from the water loss ran down into the subsoil beneath the basement floor slab causing it to heave an additional amount. This caused additional movement of the basement floor slab, the walls of the stairway and to a lesser extent the common walls causing . . . significant and damaging additional differential movement and distortion.

*Id.* at 10–11 (Minto Report) (emphasis omitted).

Mr. Minto's deposition testimony reconfirmed his opinion that "something greatly exacerbated the typical cycles of shrinkage and expanding and created movement well beyond any previous movement the home had experienced[.]" Doc. 72-5 at 34 (Minto Dep. 193:5–12). Also, he testified that "something had happened very recently that caused everything we just

talked about." *Id.* (Minto Dep. 193:21–25).  Mr. Minto testified that a water leak left unchecked certainly could have caused the damage to plaintiff's home.  *Id.* at 35 (Minto Dep. 194:12–24). Also, he testified that he was unable to say with a reasonable degree of scientific certainty that the August 2018 water leak had caused the alleged damage to plaintiff's home.  Doc. 64-5 at 9 (Minto Dep. 190:1–191:12).

## II.    Summary Judgment Standard

The standard for deciding summary judgment under Federal Rule of Civil Procedure 56 is well-known.  Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And, an issue of fact is "material" if it has the ability to "affect the outcome of the suit under the governing law[.]"  *Id.*

The party moving for summary judgment bears the initial burden of showing "the basis for its motion[.]"  *Celotex*, 477 U.S. at 323.  A summary judgment movant can satisfy this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  If the moving party satisfies its initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (citation and internal quotation marks omitted).  To satisfy this requirement, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers

to interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." *Celotex*, 477 U.S. at 324 (citation and internal quotation marks omitted).  When

deciding whether the parties have shouldered their summary judgment burdens, "the judge's

function is not . . . to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

      Summary judgment is not a "disfavored procedural shortcut[.]"  *Celotex*, 477 U.S. at 327.

Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive

determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

## III.    Analysis

      Defendant argues that it deserves summary judgment because plaintiff's insurance claim

is excluded from coverage under the Policy's "Earth Movement" exclusion.  For reasons

explained below, the court agrees that the Policy's "Earth Movement" exclusion precludes

coverage of plaintiff's claimed damage.[2]  The court explains why, below.  This explanation

begins with Kansas's standards for interpreting insurance contracts.

### A.  Interpretation of Insurance Contracts

      The parties agree that Kansas law governs their insurance contract dispute.  Doc. 61 at 2

(Pretrial Order 1.d.).  The Kansas Supreme Court has summarized Kansas law governing

interpretation of insurance contracts this way:

> The language of a policy of insurance, like any other contract, must, if possible, be
> construed in such manner as to give effect to the intention of the parties.  Where
> the terms of a policy of insurance are ambiguous or uncertain, conflicting, or
> susceptible of more than one construction, the construction most favorable to the
> insured must prevail.  Since the insurer prepares its own contracts, it has a duty to

---

[2]    Defendant asserts a second argument supporting summary judgment.  Defendant contends that plaintiff's insurance claim is not a covered loss under the Policy because the damage occurred before the Policy's effective date.  Because the court finds that defendant is entitled to summary judgment based on the "Earth Movement" exclusion, the court declines to address defendant's second summary judgment argument.

> make the meaning clear.  If the insurer intends to restrict or limit coverage provided
> in the policy, it must use clear and unambiguous language in doing so; otherwise,
> the policy will be liberally construed in favor of the insured.

*Cath. Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992).

But, if "the language in an insurance policy is clear and unambiguous, it must be construed in its plain, ordinary, and popular sense," and the court must enforce the contract as made.  *Bhd. Mut. Ins. Co. v. M.M. ex rel. T.C.*, 292 F. Supp. 3d 1195, 1205 (D. Kan. 2017) (applying Kansas law); *see also City of Shawnee v. Argonaut Ins. Co.*, 546 F. Supp. 2d 1163, 1173–74 (D. Kan. 2008) (applying Kansas law) ("If a policy is unambiguous, the intention of the parties and the meaning of the contract are determined from the instrument itself.").

"Whether an ambiguity exists in a written instrument is a question of law to be decided by the court."  *Catholic Diocese*, 840 P.2d at 458.  The controlling question a court should answer when deciding whether a policy is ambiguous asks:  What would a reasonably prudent insured understand the language to mean?  *Bhd. Mut. Ins.*, 292 F. Supp. 3d at 1205.  Ambiguity exists when the policy "contains language of doubtful or conflicting meaning based on a reasonable construction of the policy's language."  *Id.*  If the terms are ambiguous, "the construction most favorable to the insured must prevail[.]"  *Id.*  But, "[c]ourts should not strain to find an ambiguity where common sense shows there is none.  The court must consider the terms of an insurance policy as a whole, without fragmenting the various provisions and endorsements."  *City of Shawnee*, 546 F. Supp. 2d at 1174.  "An ambiguity does not exist merely because the parties disagree on the interpretation of the language . . . [it] arises only if language at issue is subject to two or more reasonable interpretations and its proper meaning is uncertain."  *Id.* at 1174–75 (citation and internal quotation marks omitted).

The Kansas Supreme Court has held:  "[W]here an insurer attempts to avoid liability under an insurance policy on the ground that the loss for which recovery is sought is covered by some exclusionary clause, the burden is on the insurer to prove the facts which bring the case within the specified exception."  *Catholic Diocese*, 840 P.2d at 460 (citing *Upland Mut. Ins., Inc. v Noel*, 519 P.2d 737, 741 (Kan. 1974)).  Here, defendant argues that the Policy's "Earth Movement" exclusion excludes coverage for plaintiff's claimed losses.  So, defendant bears the burden to prove that the undisputed summary judgment facts fall within the Policy's "Earth Movement" exclusion.  The court applies this standard to the current dispute, below.

### B.  Does the Earth Movement Exclusion Apply?

Defendant asserts that the Policy's "Earth Movement" exclusion excludes plaintiff's insurance claim from coverage.  Defendant argues that undisputed facts establish the claimed damage to plaintiff's home was caused by earth movement—not water that leaked from the water line break.  As a consequence, defendant contends, the "Earth Movement" exclusion applies to, and thus precludes, plaintiff's insurance claim.  Thus, defendant argues, the Policy excludes plaintiff's claim from insurance coverage.

As already discussed, the Policy contains an "Earth Movement" exclusion in Section C. Doc. 64-1 at 50–51 (Policy).  The Section C. exclusions apply "when any or all of the Covered Causes Of Loss, **Basic**, **Broad** or **Special**, are specified in the Declarations."  *Id.* at 50.  The Policy provides that defendant "will not pay for loss or damage caused directly or indirectly by any of the following" listed exclusions, including its "Earth Movement" exclusion.  *Id.*  "Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."  *Id.*

The "Earth Movement" exclusion provides that the Policy excludes from coverage:

2.  Earth Movement

    a.  Earthquake, including any earth sinking, rising or shifting related to such event;

    b.  Landslide, including any earth sinking, rising or shifting related to such event;

    c.  Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity ceased;

    d.  Earth sinking (other than "sinkhole collapse"), rising or shifting including soil conditions that cause settling, cracking or other disarrangement of foundations or other parts of realty.  Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

This exclusion applies whether the Earth Movement, as described in Paragraphs **a.** through **d.** above is caused by human or animal forces or any act of nature.

*Id.* at 50–51.

Defendant argues that plaintiff's factual contentions in the Pretrial Order concede that "earth movement" caused the claimed damage.  Indeed, plaintiff asserts that the water line break caused water to run "down into the subsoil beneath the basement floor slab, *causing movement* of the slab, foundation walls, multiple story panels resulting in cracks in the interior walls, foundation heaving of the floor and other damage[.]"  Doc. 61 at 5 (Pretrial Order ¶ 3.a.3.) (emphasis added).  Defendant asserts that the "movement" plaintiff alleges is "earth movement" specifically excluded by the Policy.

Defendant's argument garners support from both plaintiff's and defendant's experts. Defendant's engineer—Lawrence Fehner—concluded after his inspection of plaintiff's home that the "downward differential movement in the exterior basement walls, lessor movement of the common walls and stairway walls and some upheaval of the basement floor slab" had "developed over the years due to the swelling and shrinkage of the expansive clay subsoils

beneath the home."  Doc. 64-7 at 6 (Fehner October Report).  Mr. Fehner concluded that "this

condition has been exacerbated by the water loss that occurred in . . . 2018."  *Id.*; Doc. 64-6 at 10

(Fehner Dep. 115:24–116:10).  But, he opines that the differential movement issue with

plaintiff's home has existed for years and did not occur suddenly from the water that leaked into

the home after the water line failure.  Doc. 64-6 at 10 (Fehner Dep. 115:24–116:7); Doc. 64-7 at

3–6 (Fehner October Report); Doc. 64-9 at 3 (Fehner June Report).

Plaintiff's expert—Paul Minto—agrees.  He opines that subsoil movement caused

plaintiff's claimed damage.  His report reaches the following conclusion:

> It is my opinion water from the broken water line . . . exacerbated the differential
> subsoil movement conditions that are at this home.  Water from the water loss ran
> down into the subsoil beneath the basement floor slab causing it to heave an
> additional amount.  This caused additional movement of the basement floor slab,
> the walls of the stairway and to a lesser extent the common walls causing . . .
> significant and damaging additional differential movement and distortion.

Doc. 72-12 at 10–11 (Minto Report) (emphasis omitted).  And, Mr. Minto reconfirmed this

opinion by testifying that "something greatly exacerbated the typical cycles of [soil] *shrinkage*

*and expanding and created movement well beyond any previous movement* the home had

experienced[.]"  Doc. 72-5 at 34 (Minto Dep. 193:5–12) (emphasis added).

As defendant correctly argues, other courts—including our Circuit—have held in

insurance coverage disputes involving similar "Earth Movement" exclusions that an "Earth

Movement" exclusion precludes coverage for claimed damages caused by shifting soil—even

when water or plumbing leaks cause the shifting soil.  *See, e.g.*, *Naabani Twin Stars, LLC v. St.

Paul Fire & Marine Ins. Co.*, No. 20-2168, 2021 WL 4737119, at *1 (10th Cir. Oct. 12, 2021)

(affirming summary judgment for defendant insurer because insurance policy's earth movement

exclusion precluded coverage for damage to plaintiff's building occurring when "water from [a]

burst pipe caused soil compression and settlement, which in turn caused the damage to the

building—cracks in the floor, buckling of the exterior, breaking of sheetrock, the inability to close and open doors, significant distortions of the structural frame, broken welds in the steel framing, and pressure on the fire suppression lines"); *Wagner v. Am. Family Mut. Ins. Co.*, 569 F. App'x 574, 575–76, 579 (10th Cir. 2014) (affirming summary judgment for defendant insurer and concluding insurance policy at issue excluded from coverage damage caused by "water from [a] leaking pipe" that "eroded the soil underneath [plaintiff's] home, causing settlement and cracking of the slab, which, in turn, caused drywall and flooring panels to crack" because the claimed damage "comes squarely under the earth movement exclusion"); *Davis-Travis v. State Farm Fire & Cas. Co.*, 336 F. App'x 770, 774 (10th Cir. 2009) (affirming summary judgment for defendant insurer where "the earth supporting the slab [in plaintiff's home] expanded and contracted, as a result of water, from whatever the source, and caused settlement damage" because "[c]overage for this damage was unambiguously excluded by the [insurance policy's] earth movement clause"); *Ark. Valley Drilling, Inc. v. Cont'l W. Ins. Co.*, 703 F. Supp. 2d 1232, 1241–42 (D. Colo. 2010) (granting summary judgment to defendant insurer and concluding that the insurance policy excluded coverage for damage caused by an "underground water pipe" that "ruptured, causing sinking and heaving of the concrete slab-on-grade floor at the Property" because that "series of events constitute[d] earth sinking, rising or shifting, and include[d] soil conditions such as expansion, freezing, thawing, and the action of water under the ground surface" and the "plain meaning of the provisions of the Policy . . . exclude[d] coverage for losses caused by such movements of the earth").

Following guidance from these analogous cases, the court reaches the same conclusion here. Defendant has shown that the Policy unambiguously excludes from coverage claimed damages caused by "Earth Movement." Doc. 64-1 at 50–51 (Policy). "Earth Movement"

includes "[e]arth sinking . . . , rising, or shifting including soil conditions that cause settling, cracking or other disarrangement of foundations or other parts of realty" and "[s]oil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface." *Id.* at 51.  And, this "Earth Movement" exclusion "applies whether the Earth Movement, as described in Paragraphs **a.** through **d.** above is caused by human or animal forces or any act of nature."  *Id.*

Here, both parties' experts opine that expanding and shrinking of subsoils beneath plaintiff's home caused the claimed damage.  And, even if water from the water pipe's failure caused or exacerbated the differential movement of subsoil conditions, the Policy still excludes coverage of the claim because the "Earth Movement" exclusion applies to exclude "loss or damage caused directly or indirectly by [Earth Movement]" and "[s]uch loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."  *Id.* at 50; *see also Ark. Valley Drilling, Inc.*, 703 F. Supp. 2d at 1241–42 (holding that the "plain meaning" of the Policy's exclusion "for loss or damage caused directly or indirectly by" earth movement and which provided that such "loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss" excluded from coverage plaintiff's claimed "losses caused by earth movement . . . even if the rupture of the frozen indoor water pipe was the initial or a concurrent event that contributed to the earth movement").

Plaintiff tries to avoid this outcome with his argument that the "Earth Movement" exclusion doesn't apply here because, he contends, the Policy is ambiguous.  Specifically, plaintiff asserts that the Policy's Section "B.3. COVERED CAUSES OF LOSS – SPECIAL" conflicts with Section C.'s "Earth Movement" exclusion.  Section B.3. explicitly states that a

special loss is covered "*unless the loss is excluded in the following paragraphs or in Section C.*"

Doc. 64-1 at 84 (Policy) (emphasis added).  And, Section B.3. excludes from coverage:

> **(23)**   The following causes of loss to any building, structure or personal property:
>
> . . .
>
> > **(d)** Settling, cracking, shrinking or expansion;
>
> . . .
>
> > **(g)** Dampness or dryness of atmosphere;
>
> . . .
>
> *But if an excluded cause of loss that is listed in paragraph **(23)(a)** through **(23)(i)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.*

*Id.* at 87–88 (emphasis added).  So, this subsection's last paragraph provides coverage for some

form of damages otherwise excluded by Section B.3., if the damages are ones resulting from a

"specified cause of loss."  The Policy defines a "specified cause of loss" to include "water

damage." *Id.* at 73.  And, plaintiff argues, deposition testimony of defendant's Claim Supervisor

(Michael Cline) presents a fact issue whether the water pipe failure here is a "specified cause of

loss" that Section B.3. obliges defendant to cover.  Doc. 72 at 31.

Plaintiff's ambiguity argument correctly cites certain portions of Section B.3.  But,

tellingly, it ignores clear and unambiguous language from the beginning of that Section.  This

language provides:  "When Special is shown in the Declarations, Covered Causes of Loss means

Risks Of Direct Physical Loss *unless the loss is excluded in the following paragraphs or in

Section C.*"  Doc. 64-1 at 84 (Policy) (emphasis added).  Section C. includes the "Earth

Movement" exclusion which, as already discussed, applies to exclude plaintiff's claimed

damage.  *See id.* at 50–51.  Also, Section C. applies to exclude "loss or damage caused directly or indirectly by [Earth Movement]" and "[s]uch loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."  *Id.* at 50.  A reasonably prudent insured would understand that Section B.3. doesn't provide coverage for damages caused by "Earth Movement" because Section B.3. specifically excludes from coverage losses that are "excluded . . . in Section C. Exclusions."  *Id.* at 84.  Thus, the court finds no ambiguity in the controlling Policy language at issue here.  Instead, the court concludes, the Policy clearly and unambiguously excludes the claimed damage here because Section C.'s "Earth Movement" exclusion applies to preclude coverage.

## IV.     Conclusion

For reasons explained, the court grants defendant's Motion for Summary Judgment (Doc. 63).  The undisputed summary judgment facts present no genuine issue whether plaintiff's claimed losses and damage are covered by or, instead, are excluded from coverage under the insurance policy defendant issued to plaintiff.  To the contrary, the plain and unambiguous language of the Policy's "Earth Movement" exclusion applies to plaintiff's claimed damages and precludes coverage of plaintiff's insurance claim.

Thus, defendant is entitled to a declaratory judgment that plaintiff's claimed losses and damages are not covered by or are excluded from coverage under the Policy.  As a matter of law, defendant had no contractual obligation to provide insurance coverage for plaintiff's insurance claim under the Policy.  And, as a consequence, plaintiff's claims against defendant based on its denial of plaintiff's insurance claim fail as a matter of law.  The court thus grants summary judgment against plaintiff's claims and in favor of defendant on its declaratory judgment claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Great American

Insurance Company's Motion for Summary Judgment (Doc. 63) is granted.

**IT IS SO ORDERED.**

**Dated this 4th day of May, 2022, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**